NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____ :
CAROL MANIGAULT, Individually :
and as Administratix ad Prosequendum :
and General Administratix of the Estate :
of Jelani Darren Manigault, deceased, :
et al., :
 :
    Plaintiffs, : Civil No. 05-0422 (AET)
 :
    v. : **AMENDED MEMORANDUM &**
 : **ORDER**
 :
CHRISTOPHER KING, et al., :
 :
    Defendants. :
_____:

THOMPSON, U.S.D.J.

This matter is before the Court upon Defendants Christopher King, Fred Williams, Judd Petrone, Township of Princeton, and Princeton Township Police Department's[1] Motion for Summary Judgment, and Defendant Harry Martinez's (collectively, "Defendants") Motion for Summary Judgment. The Court has decided these Motions based upon the submissions of the parties and without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Defendants' Motions are granted.

BACKGROUND

---

[1] The Court notes that, in New Jersey, a municipal police department is not distinct from the municipality, N.J. Stat. Ann § 40A:14-118, and, therefore, the Princeton Township Police Department is not a proper defendant here. Thus, all claims against Princeton Township Police Department are dismissed. See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997) (treating the municipality and its police department as a single entity for purposes of claims brought under 42 U.S.C. § 1983).

Plaintiffs Carol Manigault and Andrew Manigault bring this action following the shooting death of their son, Jelani Manigault ("Decedent"), by Princeton Township Police Officers Christopher King, Patrolman Harry Martinez, Sergeant Judd Petrone, and Fred Williams (the "Officer Defendants"). In addition, Plaintiff Carol Manigault brings claims in her capacity as Administratix of Decedent's Estate. Plaintiff Carol Manigault is a resident of New Jersey, while Plaintiff Andrew Manigault is a resident of South Carolina. The Officer Defendants are residents of New Jersey. Defendant Township of Princeton ("Princeton") is a municipal corporation organized under New Jersey law, and is located in Mercer County, New Jersey. Defendant Princeton employs the Officer Defendants.

On January 23, 2003, Decedent was shot to death by the Officer Defendants. Plaintiffs had been concerned about erratic behavior exhibited by Decedent in the preceding days, and, following an interview with a psychiatrist at the Princeton Medical Center the day before Decedent's death, Plaintiffs, Decedent, and Decedent's girlfriend, Jennifer Arroyo, stayed overnight in a guest cottage at Tenacre, a Christian Science facility located in Princeton. (Goldstein Cert., Ex. B (Carol Manigault Dep.), at 86:19-23; 94:18-21.)

In the early morning hours of January 23, 2003, Decedent left the guest cottage, wearing only a t-shirt and sweatpants, and no shoes, despite freezing temperatures, and refused to heed his parents' and girlfriend's attempts to prevent him from leaving. (Id., at 142:9-16; 143:4-7.) Decedent drove Plaintiff Carol Manigault's car out of Tenacre, and a short while later, crashed the vehicle on Great Road. Decedent exited the car, and walked by foot to 1036 Great Road, the residence of Martha and William Sword. (Goldstein Cert., Ex. G (New Jersey Police Accident Report.)) Around 1:45 a.m., Mrs. Sword was awakened by the barking of her dogs, and heard

the doorbell ring.  (Goldstein Cert., Ex. J (Martha Sword Dep.) at 8:9-11.)  She and Mr. Sword went to the front door, where Mrs. Sword saw Decedent.  (Id., at 9:9-10.)  Concerned, Mr. Sword opened the front door.  Decedent pushed past Mr. Sword, and headed straight for a room known as the "mudroom," adjacent to the kitchen.  (Id., 9:11-21.)  Decedent appeared agitated as he walked into the kitchen and began rummaging through the drawers.  Decedent removed an eight-inch knife, and came at Mr. Sword with the knife.  Mrs. Sword screamed, and told her brother, Robert Sullivan, who was staying overnight as a guest, to come downstairs without getting dressed.  (Defs.' Statement of Material Facts, ¶ 42.)   Decedent stabbed Mr. Sword approximately fourteen times, resulting in a punctured lung, broken ribs, and knife wounds to Mr. Sword's chest, back, right arm, left shoulder, and left hand.  (Id., ¶ 43.)  Mr. Sullivan, witnessing the stabbing, came up behind Decedent, put his right forearm around Decedent's throat, and lifted Decedent off of his feet.  (Id., ¶ 44.)

   Mrs. Sword called 911, and informed the operator that an intruder was in their home, had stabbed her husband, and that her brother and husband were fighting back against the intruder.  (Id., ¶ 45.)  Mr. Sullivan managed to subdue Decedent by hitting him over the head with a frying pan a couple of times, and tried to administer aid to Mr. Sword.  (Goldstein Cert., Ex. K (Robert Sullivan Dep.), at 15:1-17:22.)  However, Mr. Sullivan noticed that Decedent was back on his feet, in the kitchen, and had slit his own wrists.  (Id., at 17:4-22.)  Mr. Sullivan managed to let Decedent out of the house, set the knife on the kitchen counter, and began to lock the doors to the house.  However, he subsequently returned to the kitchen to discover that he had not secured the door properly, and Decedent had reentered the house, and had once again cut his wrists with the knife.  Decedent then exited the home with the knife in his hand.  (Defs.' Statement of Material

Facts, ¶¶ 55-57.)

Defendant Petrone responded to a dispatch that a black male intruder had a knife and was stabbing someone inside the home at 1036 Great Road. (Goldstein Cert., Ex. L (Petrone Dep.) at 30:6-19.) On his way, he heard a second update that the intruder had been subdued on the kitchen floor. (Id., at 30:24-31:4.) Defendant Petrone arrived around the same time as Defendant Martinez, and as they were trying to locate the home in the dark, Defendant Petrone was flagged by a couple who alerted him to a crashed vehicle, but knew nothing of the stabbing incident to which Defendant Petrone was responding. (Defs.' Statement of Material Facts, ¶¶ 63-65.) Defendant Martinez exited his car, and cleared the crash vehicle to ensure that no one was in there. (Id., ¶ 67.) Meanwhile, Defendant Petrone received an update that the intruder was now outside the Swords' home and was coming down the driveway. (Goldstein Cert., Ex. L at 31:7-9.) Defendant Martinez began walking up the driveway, approximately thirty feet ahead of Defendant Petrone, when Defendants Williams and King arrived, having heard the same dispatch updates as Defendant Petrone. (Id., Ex. L at 38:19-25; Ex. M (King Dep.) at 57:11-57:24). Defendant Williams approached the crashed vehicle.

Defendant Martinez then spotted Decedent, and started to run towards him, yelling, "Drop the knife, police. Drop the knife." Defendants Petrone and King followed in pursuit. (Id., Ex. L at 39:15-18; 40:19-23; Ex. M at 63:9-18.) The Swords' yard was unkempt, with stones and trees everywhere, and was not lit. (Id., Ex. M at 63:23-64:4.) When Defendant Petrone first saw Decedent, he was approximately thirty feet away, and had illuminated Decedent with his flashlight. At this point, Defendant Petrone had drawn his gun and was holding it in his right hand. Decedent had blood on his clothing, and was holding the bloody knife with his right hand

at the level of his head.  (Id., Ex. L at 40:16-41:6; 71:11-14; Defs.' Statement of Material Facts, ¶ 80.)

Defendant Petrone was situated to Decedent's left, and Defendant Martinez was to the right of Defendant Petrone.  (Goldstein Cert., Ex. L at 41:13-16.)  They continued to command Decedent to drop his knife, and, at one point, Decedent turned his back to both Defendants Petrone and Martinez.  (Defs.' Statement of Material Facts, ¶ 86.)  Believing that Decedent was going to obey their commands, Defendants Petrone and Martinez closed the distance to within ten to fifteen feet of Decedent in order to subdue him.  (Vladyka Cert., Ex. C (Petrone Dep.) at 45:24-46:2.)  Defendant King approached, and positioned himself between Defendants Petrone and Martinez.  Defendant King estimated that, at this point, the officers were approximately twenty feet away from Decedent.  (Goldstein Cert., Ex. M at 70:13-17.)  Police officers are trained to maintain a distance of approximately twenty-one (21) feet away from a suspect with a knife, both to protect the officer's safety, and to allow the officer time to assess the threat posed by the knife, and to respond with force.  (Defs.' Statement of Material Facts, ¶¶ 90-92.)

Instead of complying with Defendants' commands to drop his knife, Decedent turned around, and stopped, facing Defendant King.  Decedent then either said, "Go ahead and kill me," or "You're going to have to kill me," and charged with the knife towards Defendant King. (Goldstein Cert., Ex. M at 72:19-25.)  Defendant King began backing up, but tripped on a tree stump behind him, and fell and landed on his buttocks and lower back in a seated position.  He kept his head up, and raised one of his feet, and yelled at Decedent to stop.  (Defs.' Statement of Material Facts, ¶¶ 96-97.)  Decedent continued moving towards Defendant King, and was approximately six feet away when Defendant King fired his gun, hitting Decedent in the pelvic

-5-

region. (Goldstein Cert., Ex. M at 78:10; Defs.' Statement of Material Facts, ¶¶ 99-100.)

At this point, the parties dispute what exactly happened next. Defendant King was prepared to fire additional shots, but lost sight of Decedent after he was hit with Defendant King's bullet. (Goldstein Cert., Ex. M at 79:17-80:3.) According to Defendant King, Decedent's head lowered, and he surmised that the downward movement actually came from Decedent's waist. (Vladyka Cert., Ex. D (King Dep.) at 80:13-16; 81:13-20; 82:14-24.) After Defendant King's shot, Defendant Petrone observed Decedent turn towards Defendant Martinez, still holding the knife, but also saw that Decedent was "stopped in his tracks." (Id., Ex. C at 51:14-25; 81:20-25.) Defendant Martinez then fired two quick shots in succession. One of the two shots struck Decedent's head, and proved to be fatal. The time between Defendant King's first shot and Defendant Martinez's second and third shots was estimated to be "almost the exact same time." (Id., Ex. D at 82:2-13; see also Ex. C at 53:13-21.) Defendant King then removed the knife from Decedent's hand, and could not discern any signs of life. (Goldstein Cert., Ex. M at 87:6-88:2.) Defendant Petrone made arrangements to secure the area, and instructed Defendant Martinez to check the situation inside the Swords' home, and told Defendant Williams to secure the end of the driveway. (Defs.' Statement of Material Facts, ¶ 106.)

While these events were unfolding, Plaintiffs and Ms. Arroyo waited at the end of the driveway. (Id., ¶ 111.) Plaintiff Carol Manigault saw a body being lifted onto a gurney after emergency medical technicians arrived, and knew "in her heart of hearts" that it was her son. (Vladyka Cert., Ex. A (Carol Manigault Dep.) at 157:4-12.) However, the next morning, Plaintiffs and Ms. Arroyo went to the police station to locate their son, and Plaintiff Carol Manigault testified that she "put two and two together" and determined that her son had died

when a detective told her that an African American male had been killed the previous night. (Goldstein Cert., Ex. B at 159:3-11.)

Plaintiffs filed a Complaint against Defendants alleging the following claims: (1) wrongful death; (2) respondeat superior against Defendant Princeton for the actions of its officers; (3) negligent hiring, training, and retention against Defendant Princeton;[2] (4) survivorship; (5) negligent infliction of emotional distress; (6) loss of services; (7) violations of 42 U.S.C. § 1983, alleging that Defendants' actions constituted an unreasonable seizure and excessive force, and violated Decedent's due process and equal protection rights; and (8) Defendant Princeton acted negligently in keeping Plaintiffs away from their son after he had been shot.  Defendants now move for summary judgment on all claims.

## DISCUSSION

A.   Standard of Review

Summary judgment is appropriate if, on the record, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000).  In deciding whether summary judgment should be granted, the Court considers "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," and construes all facts and inferences in the light most favorable to the nonmoving party.  Fed. R. Civ. P. 56(c); see also Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  To survive a motion for summary judgment, a plaintiff cannot rely merely on the

---

[2]   In their Opposition papers, Plaintiffs concede the negligent hiring claim. Accordingly, summary judgment is granted for Defendants on this count.

unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.        Excessive Force Claim

Defendants first argue that they are entitled to qualified immunity on Plaintiffs' § 1983 claim, because Plaintiffs cannot establish that Defendants violated Decedent's Fourth Amendment rights to be free from an unreasonable seizure and excessive force, contending that Defendants' use of deadly force against Decedent was objectively reasonable in light of the attendant circumstances of the situation they faced.  Plaintiffs argue that the use of deadly force was unreasonable and excessive, because Defendants Petrone and Martinez unnecessarily created a situation where such force would have to be used by maintaining a distance of less than 21 feet between themselves and Decedent.  Further, Plaintiffs contend that Defendant Martinez employed excessive force in firing two shots, including the fatal one, at Decedent, asserting that the record shows that Decedent no longer posed a threat to Defendants after he was hit by Defendant King's shot.  The Court notes that Plaintiffs have not opposed Defendants' Motions on the due process and equal protection portions of their § 1983 claims, nor have Plaintiffs opposed Defendant Princeton's motion for summary judgment on the § 1983 claim.  The Court has not found anything in the record that creates a factual dispute that would warrant a denial of summary judgment on these grounds.  Thus, the Court only considers the viability of Plaintiffs' Fourth Amendment claims against the Officer Defendants.

The use of excessive force by law enforcement officers constitutes an unreasonable seizure within the meaning of the Fourth Amendment.  Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004).  Excessive force claims are analyzed according to an objective

reasonableness standard.  Sharrar, 128 F.3d 810, 820 (3d Cir. 1997).  A court must consider the totality of circumstances, and factors a court may take into account include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 821-22.  Also informative to the court's analysis is consideration of "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004).

      Here, construing the facts in the light most favorable to Plaintiffs, the Court concludes that the Officer Defendants' actions were objectively reasonable.  The Officer Defendants, responding to a 911 call that an intruder had stabbed someone inside the Swords' residence, and having received dispatch updates informing them that the intruder had subsequently left the home, encountered Decedent in the yard of the Swords' home.  It was dark, and the only light came from the Officer Defendants' flashlights.  The Officer Defendants saw that Decedent's clothes were stained with blood, and that he was holding a knife in his right hand at the level of his head.  Decedent apparently ignored the Officer Defendants' repeated commands that he drop his knife, and after turning his back to them, abruptly turned around and began to charge towards Defendant King.  In response, Defendant King backed away, but tripped over a tree stump.  Decedent continued to advance, and Defendant King fired his gun when Decedent was approximately six feet away, knife still in hand.  Defendant Martinez fired both of his shots at Decedent almost instantaneously.  Plaintiffs argue that Defendant Petrone's testimony

established that Decedent was "frozen in his tracks" following the first shot, and, therefore, no longer posed a threat to any of the officers. However, Defendant Petrone also testified during his deposition that Decedent turned in the direction of Defendant Martinez after being struck by the first bullet, and that, in that moment, Defendant Martinez faced an armed assailant who had stabbed a homeowner, and was trying to attack his fellow officers. Further, the Court is mindful that its "recitation of these events is a discussion in slow motion of an incident that took place in a matter of seconds." Carswell, 381 F.3d at 243. In these circumstances, the Court cannot find that the Officer Defendants' use of force was unreasonable.

Plaintiffs also contend that Defendants Petrone and Martinez acted unreasonably by closing the gap between Decedent and them to within ten to fifteen feet, despite being trained to maintain a distance of at least 21 feet when facing a suspect carrying a knife. This, Plaintiffs contend, created a situation where Defendants unnecessarily used deadly force in order to subdue the threat posed by Decedent. However, Defendant Petrone testified that the officers approached Decedent after he turned his back, and after the Officer Defendants had instructed him to drop his knife. The Court concludes that a reasonable officer could have construed Decedent's actions at that moment as unaggressive, and, thus, the Court does not find that Defendants Petrone and Martinez acted unreasonably in moving closer in order to attempt to subdue Decedent.

Having found no constitutional violation, the Court grants the Officer Defendants' Motions for Summary Judgment on Plaintiffs' § 1983 claim.

C.   State Law Claims

Having granted summary judgment in favor of Defendants on Plaintiffs' sole federal claim, and there being no diversity jurisdiction, the Court declines to exercise supplemental

jurisdiction over Plaintiffs' state law claims.  28 U.S.C. § 1367(c)(3).  Accordingly, Plaintiffs' state claims are dismissed.

D.    <u>John Doe Defendants</u>

According to Fed. R. Civ. P. 21, "parties may be dropped . . . by order of the court . . . of its own initiative at any stage of the action and on such terms as are just."  Fed. R. Civ. P. 21.  A court may drop John Doe defendants pursuant to this Rule.  <u>See, e.g.</u>, <u>Adams v. City of Camden</u>, 461 F. Supp. 2d 263, 271 (D.N.J. 2006) (citing cases).  Therefore, the Court exercises its discretion under Fed. R. Civ. P. 21 to dismiss the John Doe defendants from this action because Plaintiffs have not identified these defendants or provided any basis of their liability with respect to the incident that gives rise to this action.

CONCLUSION

For the foregoing reasons, and for good cause shown,

IT IS on this 13th day of August, 2008,

ORDERED that Defendants Christopher King, Fred Williams, Judd Petrone, Township of Princeton, and Princeton Township Police Department's Motion for Summary Judgment [22] is GRANTED; and it is further

ORDERED that Defendant Harry Martinez's Motion for Summary Judgment [23] is GRANTED; and it is further

ORDERED that this case is closed.

                                        s/ Anne E. Thompson
                                        ANNE E. THOMPSON, U.S.D.J.